**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CROCS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>BIJORA, INC. D/B/A AKIRA,<br><br>                    Defendant. | Case No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Crocs, Inc., through its undersigned counsel, brings the following Complaint against Defendant Bijora, Inc. d/b/a Akira ("Defendant" or "Akira"), as follows:

## THE PARTIES

1.      Crocs, Inc. ("Crocs") is a Delaware corporation having its principal place of business at 13601 Via Varra in Broomfield, Colorado 80020.

2.      On information and belief, Bijora, Inc. d/b/a Akira is an Illinois corporation with its principal place of business located at 200 N. Fairfield Ave., Chicago, IL 60612.

## JURISDICTION AND VENUE

3.      This is an action under Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)); Section 43(a)(1)(B) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)); Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)); Section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)); Illinois' Uniform Deceptive Trade Practices Act (815 ILCS 510/2); and Illinois common law.

4.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

5.     This Court also has pendant jurisdiction over the Illinois law claims pursuant to 28 U.S.C. § 1367 because the claims are so related to the other claims in the action over which the Court has original jurisdiction that they form part of the same case or controversy.

6.     This Court has personal jurisdiction over Akira because, on information and belief, Akira is an Illinois corporation, conducts business in this judicial district, and  has deliberately engaged in significant and continuous business activities within Illinois, including sales to residents of this judicial district over the Internet.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Akira resides in this judicial district and a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Illinois through at least Defendant's unauthorized use of the Asserted Trademarks in commerce in Illinois.  The Asserted Trademarks are described below.

## GENERAL ALLEGATIONS

### I.     THE ASSERTED TRADEMARKS

8.     Crocs owns valuable trademarks. These trademarks include Crocs' iconic design marks, which are federally registered as U.S. Trademark Registration No. 5,149,328 ("the '328 Registration) (Exhibit 1) and U.S. Trademark Registration No. 5,273,875 ("the '875 Registration" and together with the '328 Registration, the "Registered Trademarks") (Exhibit 2), and they also include a common law trademark on the vamp of the shoe (the "Vamp Mark" and together with the Registered Trademarks, "the 3D Marks" or the "Crocs 3D Marks"). The Registered Trademarks are on the United States Patent and Trademark Office's ("PTO") Principal-2(F) register.

### A.     The Crocs 3D Marks

9.     The Crocs 3D Marks consist of a three-dimensional configuration of the outside of an upper for a shoe, featuring holes placed across the horizontal portion of the upper.  In addition,

2

the Registered Trademarks have a textured strip along the vertical portion of the upper having openings. Furthermore, the design of the '875 Registration also depicts a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap. The 3D Marks were first used in commerce in June 2003. Images of these marks are reproduced below, with the Vamp Mark found on the horizontal portion of the upper on both figures:[1]

**FIGURE 1: Representative Images of Crocs 3D Marks**

| Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|

 

10.     The 3D Marks were not subject to a prior registration or unsuccessful registration.

**1.      The Crocs 3D Marks Are Famous**

11.     As set forth below, the 3D Marks are widely recognized by the general consuming public of the United States as a designation of origin of the footwear products that are manufactured, sold, distributed, and promoted by Crocs. In particular, the 3D Marks are widely publicized both by Crocs and third parties; products bearing the 3D Marks are sold extensively throughout the United States; the 3D Marks are widely recognized by the consuming public; and the 3D Marks enjoy federal trademark registration.

---

[1] These images are reproduced several times in this complaint. For the sake of convenience, the Vamp Mark is not provided as a separate diagram.

> **a.** **Crocs Distributes Shoes Bearing the 3D Marks Through Many Different Channels and Market Segments**

12.     Crocs distributes its iconic footwear through a vast network of domestic distribution channels, including major retailers and department stores such as Nordstrom, Journeys, Foot Locker, Finish Line, Urban Outfitters, Shoe Carnival, Designer Shoe Warehouse, and Famous footwear; sporting good and outdoor retailers such as REI, Dick's Sporting Goods, and Academy Sports; and online retail outlets like Zappos.com, Shoes.com, and Amazon.com. Crocs also distributes its footwear through various and sundry specialty channels, including gift shops, collegiate bookstores, uniform suppliers, independent bicycle dealers, specialty food retailers, and health and beauty stores. Crocs footwear is available for sale in countless store locations domestically, and in over 90 countries worldwide. In addition, Crocs sells its footwear through its website, www.crocs.com, and in Crocs' own retail stores all over the world.

13.     Crocs' iconic Classic Clog was conceptualized during a sailing trip and originally presented to consumers as a boat shoe. Soon after, it became apparent that the shoe appealed to consumers of all demographics seeking fun and friendly, comfortable footwear. By 2005, the Crocs shoe reflected in the Crocs 3D Marks had become recognized as a new standard-bearer in the fashion footwear, professional footwear, and casual lifestyle footwear markets.

14.     Figure 2, below, highlights how the Classic Clog incorporates the 3D Marks:

**FIGURE 2: Representative Images of Crocs 3D Marks with the Classic Clog**

| Registration No. 5,149,328 | Registration No. 5,273,875 | The Classic Clog |
|---|---|---|

  

15. For the past two decades, Crocs has produced footwear, including the Classic Clog, that bears the Crocs 3D Marks. These footwear products are marketed for men, women, and children of all ages. Crocs' customers come from all backgrounds, occupations, education and income levels, and geographic regions in the United States.

16. Through unconventional collaborations with different brands, celebrities, and artists, the Classic Clog continues to reach diverse and specific psychographic market segments as the shoe is regularly repackaged into new footwear models bearing the Crocs 3D Marks. The list of these partnerships includes modern pop artists like Justin Bieber and Post Malone, Los Angeles high-fashion apparel brands Pleasures and Chinatown Market, the luxury department store Barneys New York, and fast-food chain KFC.

17. The Crocs 3D Marks also appear in footwear marketed and sold to specific occupational groups, such as the restaurant, hospitality, and healthcare industries. The rise in stay-at-home workers caused by the COVID-19 pandemic has created additional market reach into occupational segments, as working professionals have sought out comfortable, casual footwear for use during the remote workday at home.

18. Finally, Crocs has generated substantial revenue from the sales of its footwear products bearing the 3D Marks. Over the past three calendar years, for example, Crocs has sold millions of pairs of shoes bearing the 3D Marks in the United States alone, corresponding to hundreds of millions of dollars in revenue.

   **b.**  **The Crocs 3D Marks Receive Substantial Publicity and the Marks Are Widely Recognized by the Consuming Public**

19. Since its debut, Crocs footwear bearing the Crocs 3D Marks has received substantial publicity. By 2006, the Classic Clog had already morphed into "a global phenomenon"

thanks to its distinctive look. And that same year, the company's success was recognized with a marketing award for garnering more than 800 million editorial impressions.

20.     Notwithstanding marketing efforts, the design of the iconic Crocs footwear, which is depicted in the Crocs 3D Marks, is itself responsible for generating much of the publicity that Crocs receives. Its unusual and distinctive appearance caused an uproar in the fashion footwear world, and it has made the classic Crocs shoe a source of unending debate. The footwear even inspired an anti-Crocs movement on social media with millions of followers, and an "I Hate Crocs" blog, which sold its own anti-Crocs merchandise. Public figures caught wearing Crocs shoes in public have helped to keep the media spotlight trained on shoes bearing the Crocs 3D Marks. President George W. Bush made international news when he was seen wearing a pair of Classic Clogs. Former First Lady Michelle Obama also drew international attention when she was spotted in shoes with heels bearing Crocs Trademarks. And in the United Kingdom, Prince George caused Crocs footwear sales to skyrocket after he wore a pair of Crocs bearing the Crocs Trademarks.

21.     Other celebrities have also kept attention on Crocs by wearing the shoes in public, including television and movie stars like Jack Nicholson, Whoopi Goldberg, John Cena, Shia LaBeouf, Jennifer Garner, and Sacha Baron Cohen, and famous musicians like Ariana Grande, Post Malone and Justin Bieber.

22.     The Crocs 3D Marks receive substantial publicity on social media, too. For example, a viral video "Crocs Shaving Cream Challenge" has led to hundreds of thousands of online videos consisting of "filling a Crocs shoe with shaving cream and then jamming your foot in." Similarly, a viral six-second video of a grandmother wearing the classic Crocs shoe has received tens of millions of views. In addition to these viral videos, an almost infinite number of memes featuring the Crocs shoe have spread across different social media platforms, a trend which

even Crocs itself has embraced. Indeed, the Classic Clog garnered nearly 25 billion observed media impressions in 2020 alone.

### c.      The 3D Marks Are Federally Registered

23.     Two of the Crocs 3D Marks were federally registered on February 28, 2017 as U.S. Trademark Registration No. 5,149,328, and on August 29, 2017 as U.S. Trademark Registration No. 5,273,875. The Vamp Mark is a common law trademark.

### 2.      The Crocs 3D Marks Are Not Functional

24.     The 3D Marks feature one-of-a-kind ornamental design characteristics that give the overall impression of a fun and distinctively quirky clog-like shoe for which Crocs is well-known. The distinctively gentle slope of the upper gives the shoe a unique, recognizable outline.

25.     Given the virtually infinite number of different, non-infringing footwear styles in existence today, and which are available to other footwear companies, Crocs' competitors do not have any actual competitive need to use the Crocs 3D Marks in commerce.

26.     As explained in greater detail below, the Crocs 3D Marks are intentionally and frequently copied, not due to competitive need, but because of the significant goodwill that the Crocs 3D Marks have accumulated over the past two decades during their use by Crocs.

### B.      Crocs Licenses the 3D Marks

27.     Crocs has only licensed the 3D Marks on one occasion, and thus has an especially keen interest in protecting them from the kind of confusion and dilution that occurs from the unlicensed use of its marks by knockoffs that are labeled with the name of the knockoff's manufacturer.

28.     Specifically, in 2017 Crocs unveiled a licensing partnership with famed footwear designer Balenciaga. These shoes retailed for $850, and were described as one of the "hottest trends" of 2018 by Business Insider.

7

29.     The Balenciaga/Crocs cross-over shoe was a smashing success: the shoes sold out during pre-release before they were even officially available for purchase. They were offered on e-commerce sites including Barneys New York.

30.     The cross-over shoes incorporate the 3D Marks. Notably, the shoes feature round holes placed across the horizontal portion of the upper, and a textured strip along the vertical portion of the upper having trapezoidal openings. In addition to these features, the shoes also have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap, as contemplated by the '875 Registration. A representative image of these shoes are shown below:



31.     A close-up of the shoe reveals Balenciaga's name on the button connection the heel strap to the body of the shoe, which replaces the usual Crocs logo found in the same spot:



32.     Other configurations of the shoe included Balenciaga's name as a shoe charm:



## II.     PLAINTIFF CROCS

### A.     History of Crocs

33.     Crocs was founded in 2002 by three college friends and innovators who shared a love for sailing. That year, co-founder Scott Seamans saw a shoe developed and manufactured by

Canadian company Foam Creations, Inc. He came up with the idea to add a foam strap to the shoe, and the Classic Clog was born. He and his friends George Boedecker and Lyndon "Duke" Hanson embarked on a Caribbean sailing trip on a quest to perfect the shoe and, by November 2002, Crocs had sold its first thousand pairs of shoes. After expanding domestic distribution and production capacity, Crocs acquired Foam Creations in June 2004. Around that time, Crocs also added warehouses and shipping programs for speedy assembly and delivery.

34.     Crocs launched its first national marketing campaign in 2005 after partnering with a local Colorado advertising firm. The campaign played on the distinctively quirky design elements of the clog-like shoe that is embodied in the Crocs 3D Marks, and across the country, it spread the company's message that "Ugly Can Be Beautiful."

35.     Continuing in an upward trajectory, Crocs began to lay the foundation for an Initial Public Offering ("IPO"). The company turned a net profit of $16.7 million for 2005, and was named "Brand of the Year" by Footwear News. Then, in 2006, Crocs launched the largest footwear IPO in history, raising approximately $208 million in its 9.9 million-share offering.

36.     The 2008 economic downturn impacted Crocs as hard as it did any other company. It was not until 2011 that Crocs saw its first rebound, when it opened hundreds of new stores and reported sales of $1 billion worldwide for the first time in its history.

37.     Building on this success, the company implemented a return to the basics that relied on the goodwill it had established around the Crocs 3D Marks over the past decade by reintroducing the Classic Clog with attention-grabbing celebrity partnerships and a fresh ad campaign that acknowledged the company's detractors. The new "Come As You Are" campaign invited footwear shoppers to be themselves, and to recognize the false choice between comfort and style by embracing quirky, clog-like foam shoes.

38.     During the past few years, Crocs has seen continued and steady sales growth as a result of its revitalization. In 2020, the largest global fashion search platform, Lyst, reported that, based on web searches, the Classic Clog that is embodied in the Crocs 3D Marks was the eighth most wanted item in the world. The New York Times declared that "Crocs Won 2020," and fashion bloggers predicted that "2021 will be the Year of the Croc."

39.     The sale of footwear bearing the Crocs 3D Marks is responsible for the edification of Crocs as an institution in the footwear industry, and the goodwill built into these marks that continue to carry the company to greater heights.

**B.     Crocs Footwear**

40.     Today, Crocs footwear can be found in hundreds of forms and color patterns, ranging from khaki canvas loafers to tie-dyed sandals. Among this wide variety of options, the Classic Clog that features the Crocs 3D Marks remains the company's flagship shoe.

41.     Crocs has produced multiple lines of footwear that embody the Crocs 3D Marks beginning with the classic "Beach" model when the company first launched. The "Beach" Crocs shoes were soon after followed by the "Cayman", "Metro" and "Bistro" lines that also reflect one or more of the Crocs 3D Marks. As the brand's forebearers, these shoes in particular have inspired countless imitations.  The Crocs 3D Marks are also reflected in numerous other Crocs styles and models, including at least the following current footwear, each of which may include multiple models: Classic Clog (including Bae, Platform and All-Terrain models), Baya Clog, Freesail Clog, and Crocs Littles Clog.

**C.     Crocs Vigorously Defends its Intellectual Property, Including its 3D Marks**

42.     Crocs devotes significant time and resources to stopping infringement of its 3D Marks. Its enforcement actions are diverse and multi-faceted, ranging from full litigation to educational outreach depending on what is warranted by the circumstances.

43.     The scale of this infringement requires constant attention. Each year, enforcement officials around the world, including authorities in the United States, seize hundreds of thousands of shoes that improperly bear the Crocs 3D Marks. For many of these products, the United States is the intended final destination. In more recent years, the rise in consumer online shopping has enabled the sale of infringing footwear on an unprecedented scale. For example, in 2018, Crocs' defense efforts resulted in the termination of over 70,000 online auctions for infringing products, and the shutdown of over 1,500 websites, in the United States alone.

44.     Crocs works with various third-party agencies to monitor and eradicate the infringing use of the 3D Marks. One such agency Crocs has used is MarkMonitor, which monitors websites around the world for unauthorized or improper use of Crocs' trademark in their website content; the use of the Crocs brand in a domain name to redirect traffic to websites containing sponsored links or product listing for footwear sold by other companies; or web articles containing Crocs' trademarks that are used to drive traffic to paid links.

## III.     DEFENDANT

45.     On information and belief, Defendant is manufacturer, distributor, and/or retailer that uses the 3D Marks in commerce without Crocs' permission in a manner that is detrimental to Crocs and the goodwill and reputation Crocs enjoys with consumers.

46.     On information and belief, Akira is an Illinois corporation with a principal place of business located at 200 N. Fairfield Ave., Chicago, IL 60612.

### A.     Akira's Background

47.     On information and belief, Akira was founded in 2002 as a women's boutique in the Wicker Park neighborhood of Chicago.  NBC Chicago described the chain as being "somewhat of a cultural lifestyle in the city" of Chicago that holds "wild fashion show parties."

48.     Akira primarily sells its products through its approximately thirty-two brick-and-mortar stores, as well as its website, shopakira.com.

**B.     Akira's Accused Products**

49.     Akira's Accused Products include at least its "Cape Robbin Electric Soul Flatform Clogs" footwear products and colorable imitations thereof. Akira uses a variety of lengthy, descriptive names to market and sell its Accused Products. These include the "Soul Sister Flatform Sandal in Multi", the "Enjoy the Ride Flatform Sandal in Black", the "Feel the Rush Flatform Sandal in Tie Dye", the "Sit Back and Relax Flatform Sandal", and the "Sweet Like Sugar Flatform Sandal in Baby Pink."

50.     Representative images of Akira's Accused Products are shown below:

 

51.     On information and belief, Akira has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

52.     The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

C. **Akira's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks**

53. Akira manufactures, imports into the United States, promotes, distributes, and/or sells after importation in the United States Akira's Accused Products.

54. For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs 3D Marks.

> **1. Crocs Owned Protectable and Famous Trademark Rights Before Akira Promoted and Sold Accused Products**

55. On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Akira began promoting and selling the Accused Products after the Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

56. The Registered Trademarks relevant to Akira's violations are also the subject of duly issued United States Trademark Registrations.

> **2. Akira's Accused Products Are Likely to Cause Confusion with the Crocs' 3D Marks, and Have Already Caused Actual Confusion**

57. As shown in Figure 3 below, Akira's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products is confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 3: Representative Images of Akira's Accused Products and the Crocs 3D Marks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|



"Gardener"

58. On information and belief, Akira's customers have actually confused Akira's Accused Products with Crocs' footwear products that bear the 3D Marks.

59. One such "Verified Buyer" Toya, claims in a January 18, 2021 review that "I so love my crocs":



Toya *Verified Buyer*                                          1/18/2021
★★★★★
Happy customer
I so love my crocs, prefect price and color

60. Another "Verified Buyer", Bianca, wrote a review on December 28, 2020 stating, "I love these platform crocs":

15

**Bianca** *Verified Buyer*                                    12/28/2020
⭐⭐⭐⭐⭐

AMAzinG

I love these platform crocs. I wear them all the time and they're very
comfortable. i am a size 7 but since I wanted to wear fluffy sock with them, I
ordered an 8 and they fit great. These are some of my favorite shoes I've
gotten in Akira. I came back to buy more in the different colors

61.     A third "Verified Buyer" named "Princess" again called the shoes "Crocs":

**Princess** *Verified Buyer*                                   6/23/2019
⭐⭐⭐⭐⭐

Comfy Crocs

I received so many compliments on my shoes. They are very comfortable and
easy to walk in. Satisfied purchase.

62.     Yet a fourth "Verified Buyer" named Kiara titled her June 4, 2019 review "Best
crocs" and wrote that they "look so comfy":

**Kiara** *Verified Buyer*                                     6/4/2019
⭐⭐⭐⭐⭐

Best crocs

Look so comfy

63.     These reviews evidence the actual confusion consumers had for Akira's Accused
"Gardener" Products even at the point of sale.

### 3. Akira Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

64.     Akira's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Akira's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Akira's intentional copying.

### 4. Akira Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the 3D Marks

65.     On information and belief, Akira promotes and sells its Accused Products at retail stores in the United States and through the Internet, including its website, shopakira.com.

66.     On information and belief, Akira's Accused Products have been promoted and sold for approximately $60.

67.      On information and belief, Akira promotes and sells its Accused Products as a casual or lifestyle shoe primarily to women.

### 5. Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Akira's Accused Products

68.     Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Akira's Accused Products when confronted with promotions and sales of Akira's Accused Products.

69.     Indeed, as discussed above, several "Verified Buyers" of Akira's Accused Products have actually been confused at the point-of-sale as to the source of the shoe, and have referred to the Accused Products as "CROCS" despite no affiliation between Akira and Complainant.

17

70.     Further, in the post-sale context, where actual or potential consumers of shoes may only see Akira's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Akira's Accused Products with Crocs and/or the 3D Marks, or to associate the Accused Products with Crocs and/or the 3D Marks.

### 6.     Akira's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks

71.     Due to the overwhelming similarities between Akira's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Akira or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

### COUNT I: TRADEMARK INFRINGEMENT UNDER SECTION 32(1) OF THE LANHAM ACT (15 U.S.C. § 1114(1))

72.     Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

73.     As alleged more fully herein, the USPTO has granted Crocs federal trademark registrations for the Registered Trademarks set forth in Section I, *supra*.

74.     Crocs used these Registered Trademarks in commerce before Defendant began its unauthorized use of the Registered Trademarks.

75.     Defendant's unauthorized sales and attempted sales of its Accused Products containing Plaintiff's Registered Trademarks to unsuspecting consumers is a violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

76.     Defendant's past and continued sales of its Accused Products has created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

77.     Defendant's unauthorized use of Crocs' Registered Trademarks, as set forth above, constitutes use in commerce, without Crocs' consent, of a reproduction, counterfeit, copy, or

colorable imitation of Crocs' Registered Trademarks in connection with the advertisement, promotion, sale, and distribution of products and/or services. Such use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes Crocs' Registered Trademarks, in violation of 15 U.S.C. § 1114(1).

78.     As a result of Defendant's continued sale of their Accused Products, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation with not only its customers, who confuse the Accused Products with legitimate Crocs products, but also with the general public, who are confused as to the source of the Accused Products after they have been sold.

79.     Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendant's actions.

## COUNT II: FALSE DESIGNATION OF ORIGIN/UNFAIR COMPETITION UNDER SECTION 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

80.     Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

81.     Defendant's use of Crocs' 3D Marks constitutes a false designation of origin within the meaning of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which is likely to cause confusion, mistake, or deception as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of Defendant's commercial activities with respect to Crocs' 3D Marks.

82.     Crocs used these 3D Marks in commerce before Defendant began its unauthorized use of the 3D Marks.

83.     The consuming public is likely to attribute to Crocs Defendant's use of Crocs' 3D Marks as a source of origin, authorization, and/or sponsorship for the products Defendant sells and, further, purchase products from Defendant in the erroneous belief that Defendant is authorized by, associated with, sponsored by, or affiliated with Crocs, when there is no such connection between Crocs and Defendant.

84.     Defendant's actions have been conducted intentionally and willfully, with the express intent to cause confusion and mistake, to deceive the consuming public, to trade upon the quality and reputation of Crocs, and to appropriate Crocs' valuable trademark rights.

85.     Defendant's conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom they have directed their marketing activities.

86.     As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, who are confused as to the source of the Accused Products after they have been sold.

87.     Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendant's actions.

## COUNT III - TRADEMARK DILUTION UNDER SECTION 43(c) OF THE LANHAM ACT (15 U.S.C. § 1125(c))

88.     Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

89.     The Crocs Registered Trademarks are "famous" as defined in 15 U.S.C. § 1125(c). Defendant's use of these marks constitutes a use of these famous trademarks in commerce.

90. Crocs used these Registered Trademarks in commerce—and those Registered Trademarks became famous—before Defendant began its unauthorized uses of the Registered Trademarks.

91. The Crocs Registered Trademarks are widely recognized by the general consuming public of the United states as designations of source of goods and services. As set forth above, the Crocs Registered Trademarks are widely recognized in the United States and around the world, and consumers instantly recognize the connection between Plaintiff and these famous marks.

92. Defendant's sales and offers for sale of their respective Accused Products violate Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). The Defendant does so intentionally and maliciously. This has the effect of diluting the distinctive quality of Crocs' Registered Trademarks, as well as tarnishing the good will consumers associate with Crocs' Registered Trademarks.

93. As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, as Defendant's conduct lessens the value of the Registered Trademarks as identifiers of Crocs' goods and services.

94. Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendant's actions.

## COUNT IV - VIOLATION OF THE UNIFORM DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/2)

95. Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

96. As alleged more in Section I.A, *supra*, the USPTO has granted Crocs federal trademark registrations for the 3D Marks set forth.

97. Crocs used these 3D Marks in commerce before Defendant began its unauthorized use of the 3D Marks.

98. The Crocs 3D Marks acquired substantial secondary meaning and became famous or otherwise well-recognized in the marketplace before Defendant commenced its unauthorized uses of the Crocs 3D Marks in connection with the Accused Products.

99. The 3D Marks have become a single source identifier distinctly associated with Plaintiff.

100. Defendant's deceptive trade practice through use of the 3D Marks in commerce, in particular for casual footwear products, which is how Crocs uses the 3D Marks, has or will likely cause confusion in the minds of consumers familiar with Crocs' 3D Marks. Accordingly, consumers of Crocs' 3D Marks will be deceived or confused, or will otherwise be mistaken, as to the source of the business in question when they encounter Defendant's Accused Products.

101. In addition, Defendant has traded off of Crocs' popularity and goodwill in marketing, selling and profiting from the sale of their Accused Products. Defendant's Accused Products have caused, and are likely to cause in the future, impairment of the distinctiveness of the 3D Marks due to association by consumers with Defendant's similar marks and trade names. Similarly, the reputation of Crocs' 3D Marks has been harmed, and is likely to be harmed in the future, through its association with Defendant's similar marks and trade names, which occurs as a result of the promotion and sale of the Accused Products. This confusion and dilution diminish, or threaten to diminish, the capacity of the 3D Marks to distinguish Crocs goods, constituting substantial present and likely future harm to Crocs.

102. As a result of this misconduct, and other instances of unfair competition that Defendant has engaged, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public.

103. Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendant's actions.

## COUNT V - COMMON LAW TRADEMARK INFRINGEMENT

104. Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

105. As alleged more fully in Section I, *supra*, owns and has a protectable interest in the 3D Marks.

106. Crocs used the 3D Marks in commerce before Defendant began its unauthorized use of the 3D Marks.

107. Defendant's unauthorized past and continued sales of their Accused Products, as well as their attempted sales of their Accused Products, have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

108. Defendant's unauthorized use of Crocs' 3D Marks, as set forth above, constitutes use in commerce, without Crocs' consent, of a reproduction, counterfeit, copy, or colorable imitation of Crocs' 3D Marks in connection with the advertisement, promotion, sale, and distribution of products and/or services. Such use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes Crocs' 3D Marks.

109. As a result of Defendant's continued sale of their Accused Products, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation with not only

its customers, who confuse the Accused Products with legitimate Crocs products, but also with the general public, who are confused as to the source of the Accused Products after they have been sold.

110.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendant's actions.

## JURY DEMAND

Crocs demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff Crocs requests that this Court enter judgment in its favor and for relief against Defendant, and each of them, as follows:

A.  That the Court enter judgment that:

1.  Defendant has violated Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

2.  Defendant has engaged in false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

3.  Defendant has engaged in trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c);

4.  Defendant has engaged in deceptive trade practices in violation 815 ILCS 510/2; and

5.  Defendant has violated Illinois common law.

B.  That the Court issue a permanent injunction restraining and enjoining Defendant, and all of its agents, servants, officers, employees, successors, and assigns, and all other persons or entities in active concert or participation with Defendant from:

1. Selling, marketing, advertising, importing, or purchasing the Accused Products or colorable imitations thereof;

2. Using any of Plaintiff's 3D Marks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols, or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify any Defendant's goods or services;

3. Otherwise infringing Plaintiff's 3D Marks;

4. Diluting Plaintiff's Registered Trademarks;

5. Representing or taking any other action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of Defendant's products or services or as to any authorization, sponsorship, approval, or affiliation relationship between Defendant and Plaintiff;

6. Unfairly competing with Plaintiff in any manner whatsoever or otherwise injuring its business reputation in the manner complained of herein; and

7. Engaging in assignments or transfers, formation of new entities or associations or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in sub-paragraphs (1) through (6) above.

C. That the Court enter an order, pursuant to 15 U.S.C. §§ 1116 and 1118, requiring Defendant, its agents, servants, officers, employees, successors, and assigns, to destroy all Accused Products or colorable imitations thereof that are in Defendant's possession, custody, or control;

D. That the Court enter an order, pursuant to 15 U.S.C. § 1116, requiring Defendant to file with the Court and serve upon Plaintiff within 30 days after the entry of each of the

preliminary and permanent injunctions a report, in writing and under oath, setting forth in detail the manner in which Defendant has complied with Paragraphs B and C, *supra*;

E.  That the Court enter an order pursuant to 15 U.S.C. § 1117 awarding all profits received by Defendant from the sales and revenues of any kind made as a result of Defendant's sales of the Accused Products and colorable imitations thereof, and damages, to be determined, that Plaintiff has suffered as a result of Defendant's sales and marketing of the Accused Products and colorable imitations thereof;

F.  That the Court enter an order pursuant to 815 ILCS 510/3 enjoining Defendant from its deceptive trade practices;

G.  That the Court enter an order enjoining Defendants from infringing Crocs' 3D Marks in violation of Illinois law;

H.  That the Court enter an order awarding damages and costs to the fullest extent provided for by Illinois law;

I.  That the Court enter an order awarding Plaintiff's attorneys' fees and costs;

J.  That the Court enter an order awarding Plaintiff's pre-judgment and post-judgment interest; and

K.  That the Court enter such other relief as it deems proper and just.


Dated:  July 12, 2021                           Respectfully submitted,

                                                ARNOLD & PORTER KAYE SCHOLER LLP

                                                By: */s/ Mark J. Samartino*
                                                Mark Samartino
                                                Arnold & Porter Kaye Scholer LLP
                                                70 West Madison Street, Suite 4200
                                                Chicago, IL  60602
                                                (312) 583-2300

Email:  mark.samartino@arnoldporter.com

Michael A. Berta (*pro hac vice forthcoming*)
Isaac Ramsey (*pro hac vice forthcoming*)
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile:  (415) 471-3400

Thomas T. Carmack (*pro hac vice forthcoming*)
Arnold & Porter Kaye Scholer LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
Telephone: (650) 319-4500
Facsimile:  (650) 319-4700

Jacob Michael Bass (*pro hac vice forthcoming*)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile:  (212) 836-8689

*Counsel for Plaintiff Crocs, Inc.*